THUNDER BAY QUARRIES CO. *v.* POLLARD.

1. APPEAL AND ERROR—SPECIFIC PERFORMANCE—SALES—NEGLIGENCE OF INDEPENDENT CARRIER—REMAND—STIPULATIONS.

In suit for specific performance of agreement whereby seller of stone was to receive checks from government drawn in favor of buyer who was then to indorse the checks, where decree was entered for plaintiff and affirmed on appeal it would be

Foreseeability of harm as requisite to damages, see 1 Restatement, Contracts, § 330.

unnecessary to determine liability of plaintiff for alleged negligence of an independent carrier by which the stone had been delivered, especially in view of stipulation between attorneys relative to remand of case for determination of damages.

2. SALES—CONDITIONAL SALES—TITLE RETAINED AS SECURITY ONLY —LOSS.

If a sale is a conditional one and title is retained by the seller merely to secure performance of the obligations of the contract, the buyer would be liable for loss under the uniform sales act (2 Comp. Laws 1929, § 9461).

3. SAME—SALE WITH PRIVILEGE OF RETURN—STONE.

Transaction whereby seller became obligated to furnish to buyer 30,000 tons of crushed stone of an odd size which buyer was to furnish to Federal government under a certain order and after delivery of one cargo of 9,689 tons, seller sought to make immediate delivery of balance because of lack of storage space and before buyer had made deliveries to the government, terms agreed upon for second and third cargoes of 8,791 and 9,573 tons respectively whereby buyer authorized placing of respective cargoes on his dock with billing to be made as of when 75 per cent. of previous cargo had been used by government and agreeing that none of the stone was to be used to fill any orders other than those of the government constituted a sale with privilege of return and not an absolute or conditional sale or a bailment (2 Comp. Laws 1929, § 9458, rule 3, subd. [1]).

4. SAME—CONDITIONAL SALE—SALE WITH PRIVILEGE OF RETURN— PASSAGE OF TITLE—DELIVERY.

In a conditional sale, payment of the purchase price is a condition precedent for passage of legal title; while in a sale with the privilege of return, title passes on the delivery, but the vendee has the privilege of revesting it in the vendor by returning the goods (2 Comp. Laws 1929, § 9458, rule 3, subd. [1]).

5. SAME—SALE WITH PRIVILEGE OF RETURN—CONDITIONAL SALE.

In a sale with the privilege of return, the vendee has the right to return the goods rather than pay for them but in a conditional sale, such act would constitute a breach of contract (2 Comp. Laws 1929, § 9458, rule 3, subd. [1]).

6. SAME—SALE WITH PRIVILEGE OF RETURN—BAILMENT.

In a sale with the privilege of return the decision whether to exercise the privilege rests with the vendee, not the vendor;

but in bailment that decision rests entirely with the bailor, not the bailee, though the bailee may demand that the bailor take back his property (2 Comp. Laws 1929, § 9458, rule 3, subd. [1]).

7. SAME—SALE WITH PRIVILEGE OF RETURN—TIME—STONE—TITLE.

Title of stone bought by defendant under purchase with privilege of return passed to buyer where stone was delivered in three boatloads under an arrangement whereby he was to be billed for second and third cargoes when 75 per cent. of preceding cargo had been removed from buyer's dock and no return of third cargo was tendered by buyer (2 Comp. Laws 1929, § 9458).

8. SAME—SALE WITH PRIVILEGE OF RETURN—PASSAGE OF TITLE.

After title to goods sold under a sale with privilege of return has passed to the buyer, the goods are held at the buyer's risk of accidental loss though it becomes impossible without his fault to perform the condition subsequent (2 Comp. Laws 1929, § 9461).

9. SAME—EXERCISE OF PRIVILEGE OF RETURN—PASSAGE OF TITLE.

The buyer's nonexercise of the privilege of return in a sale with such privilege renders the title absolute and the buyer liable for any part of the purchase price unpaid. (2 Comp. Laws 1929, § 9458, rule 3, subd. [1]).

10. APPEAL AND ERROR—CREDIBILITY OF WITNESSES—QUESTION FOR TRIER OF THE FACTS.

The trier of the facts who has seen and heard the witnesses is the best judge of their credibility.

11. DAMAGES—UNCONTEMPLATED DAMAGES RESULTING FROM BREACH OF CONTRACT.

Where one of the parties to a contract knows that breach thereof by the other will result in damages out of the ordinary course of expectation, he cannot recover therefor unless he has given the other notice thereof.

12. SAME—BREACH OF CONTRACT—CARRIER AS AGENT OF SELLER—ANTICIPATED CONSEQUENCES.

If steamship company be considered agent of seller of stone, then no liability for breach of contract would attach to carrier for damages suffered by buyer through collapse of river bank from overloading because of loss of stone and expense of removal where, although it appears buyer knew of subsoil conditions, he failed to communicate such information to ship's officers when stone was delivered and circumstances disclosed would reasonably cause such officers to believe dock capable of holding cargo.

13. Shipping—Independent Contractor—Carriers—Tort Liability—Proximate Cause.

No liability in tort would attach to steamship company for loss of quantity of stone deposited on buyer's dock and expense of removing it from river into which it slid less than 12 hours after last cargo had been unloaded if company be considered as an independent contractor where it does not appear that any negligence on part of carrier was the proximate cause of the loss suffered.

14. Evidence—Credibility of Expert Witnesses.

In an action for damages sustained by buyer of stone when, because of subsoil conditions and overloading of bank, a quantity of stone slid into river and was lost and buyer put to expense of removing same from river bed, trial court had a right to believe defendant water carrier's expert witness that stone might have been lost even if last cargo had not been added to previous cargoes rather than buyer's expert.

15. Appeal and Error—Finding by Court—Discount—Extension of Time.

Finding of trial judge that defendant buyer of stone was not entitled to discount of 5 cents a 'ton on a portion of first cargo of stone delivered is not disturbed where payment for such stone was not ade within time limited for discount and such time was not extended as claimed by buyer.

Appeal from Wayne; Merriam (DeWitt H.), J. Submitted January 7, 1942. (Docket No. 41, Calendar No. 41,845.) Decided April 6, 1942.

Bill by Thunder Bay Quarries Company, a Delaware corporation, against B. J. Pollard to require indorsement of checks, and for injunction and other relief. Cross bill by defendant Pollard against plaintiff and John J. Boland and Adam E. Cornelius, individually and as copartners doing business as Boland & Cornelius, and American Steamship Company, a foreign corporation, to obtain damages for alleged negligence in the delivery and unloading of stone from a boat. Decree for plaintiff and cross bill dismissed. Defendant Pollard appeals. Affirmed.

*Butzel, Eaman, Long, Gust & Bills (A. Hilliard Williams* and *David A. Howell,* of counsel), for plaintiff.

*Kelly, Kelly & Kelly,* for defendant and cross-plaintiff Pollard.

*Hill, Hamblen, Essery & Lewis (Sparkman D. Foster,* of counsel), for cross-defendants.

Butzel, J. On May 20, 1938, defendant B. J. Pollard, who was engaged in the business of selling stone, obtained an order from the Works Progress Administration of the Federal government for 30,000 tons of crushed stone of an odd size, to be used by the W.P.A. for pavement of alleys. Pollard rented a parcel of property of approximately 13 acres on West Fort street, Detroit, Michigan. It has a frontage on one side of 625 feet, or thereabouts, abutting on the Rouge river, near where it runs into the Detroit river. The government contract was elastic in that it gave the government the privilege of increasing or decreasing the order to the extent of 25 per cent. The contract provided that deliveries could not be made without the government's consent after June 30, 1938. The government accepted delivery of the full 30,000 tons and evidently a cancellation had not been anticipated. The crushed stone was not of a standard size carried by quarries and as a rule would have to be manufactured, although in this particular case it could largely be gathered together from the small pieces left over in the quarrying of large-sized stone. Pollard negotiated with the Thunder Bay Quarries Company, plaintiff herein, for stone to fill the government contract. Just what the agreement with the plaintiff was became one of the main issues of the present litigation. It is con-

ceded that plaintiff was to furnish stone at 90 cents per ton less 5 cents discount should payment be made in 30 days.

Pollard claims that he ordered only one boatload of stone on May 20, 1938, and it was shipped June 2, 1938, by the steamship George F. Rand. It was delivered at Pollard's dock with the charges paid by plaintiff in accordance with a purchase order for one boatload of the stone, signed by Pollard, sent plaintiff. Pollard's dock consisted of unimproved property on the Rouge river. Pollard had covered part of it with a sprinkling of lime waste, evidently to keep the stone clean when it arrived. This dock, consisting of land abutting the shore, had no reinforcement or artificial support either under or on the surface along the bank. Shortly after the delivery of this first cargo consisting of 9,689 tons, and after some telephone conversations, two other shipments were made. On June 16, 1938, 8,791 tons, and on July 8, 1938, 9,573 tons, of the specified stone were consigned to Pollard by the steamer Consumers Power. All of plaintiff's three bills referred to order C 229. The second shipment was made after plaintiff received a letter signed by Pollard. It stated that:

"Relative to our telephone conversation of June 9th, about placing second cargo of stone on my dock to apply on W.P.A. order 51 34182 this material to be billed as of date when 75 per cent. of present cargo has been removed. I further agree that none of this material will be used to fill any other than above-mentioned order."

The third shipment was sent after the receipt of a letter from Pollard, which stated:

"This is to authorize the placing of 3d cargo of 4″ down stone on my dock in Detroit. Billing to be

made as of when 75 per cent. of 2d cargo has been used by W.P.A.

"It is agreed by me that none of this stone will be used to fill any orders other than W.P.A. 51 34182."

The order for the first shipment did not contain the agreement by Pollard that the material would not be used to fill any order other than this specific one from the W.P.A., but the stone of odd size was ordered for this purpose. At the time that the second shipment was made by plaintiff, no part of the stone from the first shipment had been delivered to the government. At the time the third shipment was made, a small quantity, less than either of the first two shipments, had been delivered to the government. However, the government was beginning to take a substantial amount almost at regular short intervals of a day or two from and after July 1, 1938.

Eleven hours and 35 minutes after the completion of the unloading of the third shipment on Pollard's dock, the bank of the river gave way and sheared off and an undetermined portion of the stone piled thereon slid into the river. Some of the stone was retrieved but 3,180 tons were never recovered. Pollard was ordered by the United States War department to clear the river of the stone in order to restore the navigability of the stream and he was put to a large expense in recovering part of the stone. One of the main controversies in the case is, Who is responsible for the loss of the stone that was not retrieved and for the expense of recovering that which was salvaged?

Because plaintiff was unwilling to extend credit to Pollard either for the large amounts that would become due it, and inasmuch as Pollard's credit was not too strong, and the government would not permit

the assignment of the proceeds of the contract, Pollard agreed that the government should forward its checks, made payable to Pollard, to plaintiff, and that Pollard would thereupon indorse them over to plaintiff up to the amount of his indebtedness. This agreement was assented to by the government. Pollard at first for some time carried out this agreement after the slide occurred. Later, however, when plaintiff presented checks to him for indorsement, he retained them and refused to return them to plaintiff. The latter thereupon filed a bill for specific performance in the instant case to compel Pollard to turn over the checks duly indorsed to it according to the agreement. Pollard, in turn, in addition to his answer, filed a cross bill in which he impleaded the American Steamship Company, which owned the steamer Consumers Power, and also Boland and Cornelius, its managing agents, as defendants. The steamship company and agents finally withdrew their objections to being thus impleaded so that the entire controversy could be settled in one suit. As a court of equity was the proper forum in which to file a bill for specific performance in the first place, and the impleaded parties consented to the jurisdiction, and no claim of error is made on that account, all questions were disposed of in this equity suit. The judge held that, as there was no liability on the part of plaintiff Thunder Bay Quarries Company or cross-defendant American Steamship Company or its agents, Pollard was liable for the balance due plaintiff for stone that had been delivered. Defendant Pollard appeals from decree against him and from denial of a decree against plaintiff and the others as cross-defendants.

The questions involved are largely those of fact. Did Pollard absolutely purchase the three cargoes of stone, did he enter into a conditional sales contract,

was he simply a gratuitous bailee who took reasonable care of the stone which was lost, as he claims, without any fault on his part, or what was the agreement? Were the steamship company and its agents liable for carelessly unloading the stone contrary to instructions given by Pollard, and was this the cause of the cave-in? In view of our decision and that of the circuit judge, we need not discuss whether plaintiff would be liable for the carelessness of an independent carrier by which the stone had been delivered, or, if the steamship company alone was liable, we should remand the case in accordance with the stipulation between the attorneys, in order to ascertain the damages.

The first question is, what was the contract between plaintiff and Pollard? In regard to the last two cargoes, Pollard concedes that the plaintiff obligated itself to furnish the additional stone should he need it over and above the first cargo and up to the total amount of 30,000 tons of stone. The testimony clearly indicates that the plaintiff finished the mining or collection of stone for the second and third shipments before Pollard required them; that its bins were filled to overflowing, so that it had no place to store the stone, and that plaintiff's agent telephoned Pollard informing him of these facts and asking him for permission to make the second and third shipments immediately, and this Pollard did only upon the condition that the billing in each case should at least not be dated until W.P.A. should use 75 per cent. of the preceding shipment. Pollard contends that he never acquired title to the second and third cargoes and that the transaction amounted to a conditional sale or a bailment. If, as Pollard claims, the sale was a conditional one and title retained by plaintiff merely to secure performance of the obligations of the contract, Pollard would be

liable for the loss under the uniform sales act, Act
No. 100, § 22(a), Pub. Acts 1913 (2 Comp. Laws
1929, § 9461 [Stat. Ann. § 19.262]). We have ex-
amined the record with much care and conclude from
it that the transaction in question falls midway be-
tween an absolute and conditional sale and consti-
tuted a sale with privilege of return. It did not
constitute a bailment. If the W.P.A. did not use an
amount equal to 75 per cent. of each of the respective
cargoes, plaintiff could not bill Pollard for it.
Pollard could not sell the later cargoes to anyone
but the W.P.A. He would have no personal use for
the stone and hence would have no alternative but
to return the second or third cargo, or both, to plain-
tiff as the case might be. The additional time in
billing gave Pollard the favorable terms that he was
entitled to.

There are marked distinctions between a sale with
the privilege of return on one hand and a conditional
sale or bailment on the other. In a conditional sale,
payment of the purchase price is a condition preced-
ent for passage of legal title; while in a sale with
the privilege of return, title passes on the delivery,
but the vendee has the privilege of revesting it in the
vendor by returning the goods. The uniform sales
act, Act No. 100, § 19, rule 3, subd. (1), Pub. Acts
1913 (2 Comp. Laws 1929, § 9458 [Stat. Ann.
§ 19.259]). In a sale with the privilege of return,
the vendee has the right to return the goods rather
than pay for them; in a conditional sale, such act
would constitute a breach of contract. In the instant
case, had W.P.A. used less than the prescribed per-
centage of the preceding cargo or cargoes, Pollard
would not only have had the privilege, but it would
have been his duty, to return the shipment or ship-
ments unused. In a sale with the privilege of return
the decision whether to exercise the privilege rests

with the vendee, not the vendor; in bailment that decision rests entirely with the bailor, not the bailee, though the bailee may demand that the bailor take back his property. In the brief filed on behalf of Pollard, he seems uncertain as to the nature of the contract. Possibly he claims it was a bailment until he appropriated the goods. To us it seems to be a sale with the privilege of return, but irrespective of what it was, Pollard never elected to return any of the stone and title passed to him. W.P.A. did use an amount greater than the whole first cargo plus 75 per cent. of the second. Hence the "time fixed in the contract" for returning any of the stone has passed. 2 Comp. Laws 1929, § 9458 (Stat. Ann. § 19.259). After title has been "transferred to the buyer, the goods are at the buyer's risk." Uniform sales act, Act No. 100, § 22, Pub. Acts 1913 (2 Comp. Laws 1929, § 9461 [Stat. Ann. § 19.262]). Thus, "in a sale on credit with the right to return the goods and thereby divest liability for the payment of the price, the buyer remains liable though it becomes impossible without his fault to perform the condition (subsequent). The risk of accidental loss is on him." 3 Williston, Contracts (Rev. Ed.), § 809, and cases cited in note 3.

It will serve no useful purpose to review all of the testimony as to the placing of the contract and the orders. In the last analysis, the three cargoes were all deposited in one long pile of stone. They were not segregated in any way and there was no possible way of telling which stone went into the river. Pollard used up an amount equal to the first and second cargoes and almost two-thirds of the last cargo. As the record stands, by his own testimony Pollard does not know how much stone slid into the river, much less from which cargo or cargoes it came. Pollard cites and relies on *Larkin* v. *Mitchell & Rowland Lumber Co.*, 42 Mich. 296, but that case is

clearly distinguishable from the present one for there the customer segregated the goods in excess of his order in a separate pile. He did not commingle the goods with those he bought. The goods were all the same. He took off from the segregated goods that he did not order a sufficient amount so as to make up his only order. All goods segregated were destroyed by fire. We held the purchaser was not liable as title never passed.

The judge came to the correct conclusion. He did state that when the bills were sent for the second and third shipments they were entered by Pollard's bookkeeper in the bills payable book. The testimony showed that she did this without any instructions from Pollard and without his knowledge. The judge may not have believed the witnesses but even conceding that the bills were so entered, we believe that nonexercise of the privilege of return rendered the sale absolute, if it was not absolute before, and Pollard became liable for the balance due on all three shipments. After the suit was begun the amount received from the government was deposited in court and, by stipulation, sufficient was turned over to plaintiff without prejudice so that in the event it succeeded in the present litigation, only a comparatively small amount and interest would still be due it. Judgment was entered for this amount.

Pollard seeks to hold the steamship company and its agents liable on the theory that the slide was caused by the overloading of the dock in violation of his instructions given to the officers of the Consumers Power which delivered the third cargo. The testimony of Pollard and the other witnesses on his behalf on the one hand and that of the captain and first and second mates of the Consumers Power, while they agree in many details, are absolutely

irreconcilable as to others. The judge saw the witnesses and resolved the conflict in favor of the steamship company and its officers. *Baker* v. *Frischkorn*, 271 Mich. 485. All witnesses agree that the pile before the unloading of the third cargo was longer than it was wide, that its length ran north and south parallel to but back from the river front, that it was topped by a ridge instead of a crest running north and south the greater part of its length, that this was caused by the difference in length of the boom of the first steamer, the Rand, and the shorter boom of the Consumers Power, which unloaded the last two cargoes. On the southwest corner of the pile was a large unfilled space caused by the removal of the 1,817 tons delivered to the W.P.A. before the slide had taken place. There was also a smaller hole in the northerly end of the pile. On the unloading of the third cargo the southwest hole was first filled up. Pollard claims he gave specific instructions to the second mate about 11 p.m. of July 9, 1938, and thereupon left for the night, and returned the next day after the vessel had departed. When Pollard left the night of July 9, over 3,000 tons of the third cargo had been already unloaded. The remaining 6,000 tons, or thereabouts, were unloaded within the next two hours. Pollard testified that he had caused an 80-foot area north of the pile between the north end thereof and a truck road to be prepared to accommodate a large portion of the third shipment by having a lime waste carpet laid thereon with a bulldozer. He had instructed the second mate to fill up this area, but instead of doing so, the ship's officer filled up the crevice running north and south and then backed the boom over the center of the pile, so that the remainder of the stone kept growing higher in that one spot until the pile was conical in shape. This

left a certain amount of carpeted space unused. Several disinterested witnesses, neighbors of Pollard, corroborated this part of Pollard's testimony. The officers of the Consumers Power, on the other hand, deny that they piled the stone in one spot or left it in a conical shape and assert that they only increased the height of the pile by filling in the crest and that thereafter most of the stone rolled over such newly made crest down the back rather than down the front of the pile. They explain that although the boom of the Consumers Power was shorter than that of the Rand, it was nevertheless able to overreach the crest left by the Rand boom on the first unloading, because on the third unloading after the southwest hole and ridge had been filled up, the Consumers Power was higher out of the water and capable of coming in much closer to the shore than the Rand had been on the first unloading. The ship's officers also explained the failure to fill up the space north of the pile as due to the fact that there were no "dead men" (shore fixtures) to which they could fasten their lines although there was "rip rap" (old spiling emerging from the river) a short distance upstream, but it was so rotten that it would be unsafe to send a man on it or attach a line to it. The second mate testified he made these facts known to Mr. Pollard, who thereupon abandoned his request that stone be piled to the north and stated that he intended sometime in the future to put in "dead men" to the north, although the land in that direction did not belong to him. The second mate testified also that in his opinion there were not more than five feet of prepared area north of the pile and south of the truck road, rather than 80 feet, and when confronted with a photograph after the slide showing a substantial area north of the pile and south of the road covered

by an unused lime waste carpet, he stated that it might be trick photography and he was more confident of his personal observation of actual conditions. It is obvious, therefore, that the issues presented by Pollard in his cross bill are controverted and that a prerequisite of deciding them is the determination of credibility, of which the trier of the facts, who has both seen and heard the witnesses, is the best judge. However, even assuming that Pollard's unloading instructions were violated, it is undisputed that he told the ship's officers not to pile any of the third cargo south of the existing pile, although there was plenty of room and facilities such as "dead men" to do it there, because he wanted to use that area for unloading 250,000 tons of Kelly Island stone in connection with another contract. Pollard testified that actually 150,000 tons were unloaded in this space after the slide without mishap. It was not even remotely brought to the attention of the ship's officers that a violation of Pollard's claimed instructions would in any way endanger the dock. While the brief described the length of the Pollard dock as having a frontage of 700 feet abutting the Rouge river, the map introduced as an exhibit shows the actual frontage to be 636.9 feet. The witnesses with one exception all agree that the stone pile extended about 225 feet along the river. If Pollard expected to utilize the remaining 411.9 or 475 feet for 250,000 tons of stone, he certainly had no fear of a slide or cave-in from the deposit of 30,000 tons over 225 feet, or even less. He did not express any apprehension to the officers of the Consumers Power although he testified upon the trial that he knew of the fact that subsoil conditions were bad in that vicinity. On the contrary, Pollard's statement that he intended to pile 250,000 tons of stone to the south would tend to assure the ship's officers that the bank was fully

capable of sustaining all that they could unload within the length of the long boom of the vessel. Pollard's theory throughout has been that the American Steamship Company was merely the agent of the plaintiff in delivering the stone and not an independent contractor. Assuming, without deciding, that there is any merit to this contention, it would follow that the relationship between Pollard and the steamship company arose out of a contract between Pollard and the plaintiff. In such event, the claim against the steamship company must fail, under the rule set forth in the leading case of *Hadley* v. *Baxendale*, 9 Ex. 341 (2 C. L. R. 517, 23 L. J. Ex. 179, 18 Jur. 358, 2 W. R. 302, 156 Eng. Rep. 145), which is the first of a long line of authorities establishing the proposition that where one of the parties to a contract knows that breach thereof by the other will result in damages out of the ordinary course of expectation, he cannot recover therefor unless he has given the other notice thereof. Otherwise, such consequences will be held not to have been within the contemplation of the parties. See 5 Williston on Contracts (Rev. Ed.), § 1356, and the cases therein cited. Also, see McCormick, ''The Contemplation Rule as a Limitation upon Damages for Breach of Contract,'' 19 Minnesota Law Review, 497. If the steamship company be regarded as an independent contractor, then the claim for reimbursement would sound in tort rather than contract, but such recovery would be subject to the rule of proximate cause, which the trial court found nonexistent.

An expert witness was introduced on each side. Notwithstanding their highly technical and scientific testimony, and particularly that of appellant's expert, the most we can conclude from it is that the slide did take place, a fact already proven, because of subsoil conditions and the subjecting of the soil

and surface to a heavier load than it could stand. The expert for cross defendants was the senior engineer of the United States engineer's office, who had been employed as chief civil engineer in the war department and for four years had familiarized himself with the soil conditions in the vicinity of the dock and who visited the property within a day after the land sheered off into the river. He testified that it was impossible to tell whether it was the last load or the first two loads that caused the dock to collapse; that the only other pile of stone where there had been a collapse along the banks of the Rouge River had remained undisturbed for three months before the dock caved in. There is no question but that the piling of the stone on the dock was the cause of the cave-in, but we hold the judge had a right to believe cross defendants' expert, who testified that the slide might have occurred even if the third cargo had not been added to the pile.

Pollard, as appellant, raises only one other question that it is necessary for us to discuss. He claims that he is entitled to a discount of 5 cents a ton on the first cargo. The written order shows that he was only entitled to this discount if he paid within 30 days after delivery. This he did not do. He claims the time was extended. Plaintiff's witness denies that such extension was given. The judge believed the plaintiff's witness. Under the circumstances, we do not care to disturb the judge's finding.

Decree is affirmed, with costs to plaintiff and cross defendant.

CHANDLER, C. J., and BOYLES, NORTH, STARR, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.